R. BRIAN DIXON, Bar No. 076247
LITTLER MENDELSON
A Professional Corporation
650 California Street, 20th Floor
San Francisco, CA 94108.2693
Telephone: 415.433.1940
Facsimile: 415.399.8490
E-mail: bdixon@littler.com

DOUGLAS A. WICKHAM, Bar No. 127268
LAUREN T. HOWARD, Bar No. 227984
LITTLER MENDELSON
A Professional Corporation
2049 Century Park East, Fifth Floor
Los Angeles, California 90067.3107
Telephone: 310.553.0308
Facsimile: 310.553.5583
E-mail: dwickham@littler.com; lhoward@littler.com

Attorneys for Defendant
JPMORGAN CHASE BANK, N.A., as acquirer of certain assets and liabilities of Washington Mutual Bank from the Federal Deposit Insurance Corporation acting as receiver (Washington Mutual Bank formerly known as Washington Mutual Bank, F.A.)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN MINKOW, an individual; CHRIS O'BRIEN, an individual; and JUDY HOFFMAN-BARRON, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON MUTUAL BANK, a Washington Corporation; WASHINGTON MUTUAL BANK, F.A., a Washington Corporation; and Does 1 through 100, inclusive,<br><br>Defendants. | Case No. CV08-05960 R (RCx)<br><br>**FINDINGS OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW** |

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN MINKOW, an individual; CHRIS O'BRIEN, an individual; and JUDY HOFFMAN-BARRON, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON MUTUAL BANK, a Washington Corporation; WASHINGTON MUTUAL BANK, F.A., a Washington Corporation; and Does 1 through 100, inclusive,<br><br>Defendants. | Case No. CV08-05960 R (RCx)<br><br>**FINDINGS OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW** |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

In accordance with Rule 56 of the Federal Rules of Civil Procedure, the Motion for Summary Judgment of Defendant JPMorgan Chase Bank, N.A.'s (as acquirer of certain assets and liabilities of Washington Mutual Bank from the Federal Deposit Insurance Corporation acting as receiver) ("Defendant") came on regularly for hearing on July 27, 2009, the Honorable Manuel L. Real, United States District Judge presiding.

The Court, having considered the points and authorities submitted by the parties, the declarations and exhibits thereto, the relevant pleadings and papers on file with the Court and having heard the oral argument or counsel thereon, and having fully considered the law and facts disclosed by this record, hereby makes the following findings on uncontroverted facts and conclusions of law:

## STATEMENT OF UNCONTROVERTED FACTS

1. Plaintiffs Judy Hoffman-Barron ("Hoffman-Barron"), Brian Minkow ("Minkow") and Chris O'Brien ("O'Brien") (collectively, "Plaintiffs") joined Washington Mutual Bank ("WaMu" or the "Bank") following its acquisition of Home Savings of America. After joining WaMu's payroll in late June or early July 1999, Plaintiffs subsequently participated in WaMu's Loan Consultant Incentive Plan and Sales Assistant Program beginning on January 1, 2000.

2. After becoming employees of WaMu in 1999, Plaintiffs were employed by the Bank as at-will Home Loan Consultants in WaMu's Westlake Village, California Home Loan Center until approximately April 2008.

3. Through its Home Loan Centers, WaMu originated and sold residential mortgages and loans to customers. In this capacity, Plaintiffs, as Home Loan Consultants served as the primary salespersons for these home loan products, and they were responsible for, among other things, originating loans and mortgages issued on behalf of the Bank.

4. Generally speaking, Plaintiffs' duties and responsibilities consisted of the following: being responsible for origination of home loans through various sales and

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

1.

marketing efforts, counseling potential customers about various home loan products, assisting prospective borrowers when filling out the home loan application, preparing a good faith estimate, making arrangements for appraisals and title reports, opening and coordinating with escrow companies, communicating with borrowers throughout the process, providing outstanding customers service, and generally shepherding a home loan through the approval process, which ultimately led to closing on the home loan transaction and the funding of a loan.

5. All Loan Consultants, including Plaintiffs, were primarily responsible for performing these duties, and all Loan Consultants, including Plaintiffs, were provided with support within the Bank for all phases of the loan origination process. Among other things, WaMu provided foundational support staff to Plaintiffs through its Loan Fulfillment Center, which was responsible for handling loan processing and other administrative responsibilities following a loan's origination.

6. In connection with the origination and funding of home loan products, WaMu generally received revenues in the form of points and fees in connection with home loans.

7. In turn, based upon all of the terms and conditions of the Bank's Loan Consultant Incentive Plans ("LCI Plan"), Plaintiffs (as Home Loan Consultants) were eligible to earn monthly, quarterly and annual commissions and other incentives, all of which were subject to and governed by the terms and conditions of the LCI Plans and all related plans and policies, including WaMu's Pricing Exception Policy, LCI Plan Administrative Guidelines, Sales Assistant Plan and, in the case of Minkow and O'Brien, WaMu's Partnership Plan.

8. WaMu's LCI Plans were issued annually at the outset of each applicable plan year. The LCI Plans formed the general compensation scheme applicable to all Loan Consultants, and where applicable (as with Plaintiffs), it incorporated the more specific terms and conditions set forth in WaMu's Sales Assistant Plan and Administrative Guidelines.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

2.

9. Generally speaking, Plaintiffs were eligible to earn two forms of commissions: (1) a set, per-unit commission for each home loan, and (2) a percentage, or so-called "basis point," commissions based on the gross dollar amount of each home loan. In turn, the value of the Plaintiffs' gross commissions was determined on an incrementally-tiered schedule, such that the value of the per-unit and basis point commissions would increase as the total number and dollar value of the loans originated increased.

10. Commissions were paid to Loan Consultants bi-monthly. In this regard, after the values of Plaintiffs' gross commissions were determined based on Plaintiffs' total loan production each month, their gross commissions were subject to a reconciliation process. During the reconciliation process, Plaintiffs' gross commissions were subject to upward and downward adjustments that ultimately resulted in Plaintiffs' net commissions being determined for the month. These net commissions amounts represented Plaintiffs' gross wages, which were paid to Plaintiffs through WaMu's payroll department.

11. Plaintiffs' commissions were not vested until the reconciliation process was completed and Plaintiffs' net commissions were ultimately determined.

12. In this regard, Plaintiffs' gross commissions were subject to upward adjustments, as well as different types of downward adjustments, during the reconciliation process.

13. For example, if Plaintiffs' loan production during the second half of the month caused Plaintiffs to move to a higher payout "tier" (making the Loan Consultant eligible for a higher gross commission), their gross commissions for the first half of the month would be recalculated at the higher rate, through an upward adjustment applied during the reconciliation process.

14. Alternatively, Plaintiffs' gross commissions were potentially subject to several types of downward adjustments, including adjustments for "pricing

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

3.

exceptions," partnership adjustments, and adjustments related to Plaintiffs' participation in WaMu's Sales Assistant Program.

15. Specifically, Plaintiffs had the ability to utilize "pricing exceptions," whereby, for example, they could quote below published pricing to close a loan. If Plaintiffs chose to use a pricing exception, the LCI Plan provided that "the cost of the pricing exception . . . resulted in a change in the amount of the commissions earned by the [Loan Consultant]." In other words, this resulted in a downward adjustment from Plaintiffs' gross commissions during the reconciliation process.

16. Additionally, Plaintiffs' gross commissions were potentially subject to upward and downward adjustments based on their participation in the Partnership Plan. In fact, Plaintiffs Minkow and O'Brien participated in a Loan Consultant partnership throughout the relevant period of this case. As such, one individual would be designated the primary (or senior) partner each applicable partnership year, while the other was designated the co-partner (or junior partner) during that time period. As such, gross commissions generated by Plaintiffs Minkow and O'Brien were subject to upward and downward adjustments, to allocate their gross commissions and expenses in accordance with the pre-determined partnership split amongst the two.

17. Moreover, because Plaintiffs continually elected to participate in WaMu's Sales Assistant Program throughout the relevant period, Plaintiffs' gross commissions were subject to downward adjustments for amounts they agreed to allocate to their Sales Assistants.

18. WaMu's Sales Assistant Program was a voluntary benefit offered to eligible, high-producing Loan Consultants, whereby those Loan Consultants could elect to retain the use of one or more Sales Assistants to whom they could delegate some of their duties and responsibilities. In general, the Sales Assistant(s) would work with the Loan Consultant, as a team, to assist with increasing loan production and, in turn, gross commissions.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

4.

19. In this regard, each Sales Assistant was hired by WaMu only because their assigned Loan Consultant chose to participate in the Sales Assistant Program and elected to retain the support of a Sales Assistant. WaMu did not retain a pool of Sales Assistants to be allocated to Loan Consultants as necessary; rather, each Loan Consultant, including Plaintiffs, made an individual decision whether to participate in the Sales Assistant Program and, in so doing, assisted their manager in interviewing and hiring an assistant to bring onto their team.

20. In turn, each Sales Assistant's employment was wholly contingent on their assigned Loan Consultant's continued employment and participation in the Sales Assistant Program.

21. Participation in the Sales Assistant Program was not automatic; rather, only those Loan Consultants whom met a minimum volume of loan production during the prior year (or other applicable measurement period) qualified to participate in the Sales Assistant Program.

22. To qualify for a Sales Assistant in calendar year 2000, a Loan Consultant's production minimum must have been at least $40 million or 300 units in loan volume during the prior year. To qualify for a Sales Assistant for calendar years 2001 through 2004, these eligibility amounts were adjusted to $36 million of 270 units in loan volume. Importantly, a participating Loan Consultant must have met these eligibility minimums for each Sales Assistant the Loan Consultant sought to retain.

23. WaMu's Sales Assistant Program was a voluntary program and incentive for qualified Loan Consultants, in which Loan Consultants could affirmatively elect to participate. Loan Consultants were not required to participate in the Sales Assistant Program, and Loan Consultants were fully capable of performing all aspects of their jobs without the assistance of a Sales Assistant. In fact, nearly two-thirds of WaMu's California Loan Consultants did not participate in the Sales Assistant Program during the relevant time period.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

5.

24. Plaintiffs voluntarily elected to participate in the Sales Assistant Program beginning on or around January 1, 2000. In this regard, Plaintiffs were required to have met the production eligibility minimum during the prior measurement period in order to qualify for the Sales Assistant Program, *i.e.*, $40 million in gross loan production or 300 units. Based on the commission tier structure in the applicable LCI Plan, this means that Plaintiffs must have earned a minimum of $240,000 in gross commission during the same period, which amount only represents Plaintiffs' basis point commission.

25. If Plaintiffs fell below this production qualification minimum, they would no longer qualify for participation in the Sales Assistant Program or the support of any Sales Assistants.

26. Upon initially qualifying for the Sales Assistant Program in 2000, Plaintiff Hoffman-Barron was initially eligible for and elected the support of one Sales Assistant. Similarly, upon initially qualifying for the Sales Assistant Program and forming a partnership in 2000, Plaintiffs Minkow and O'Brien were initially entitled to and elected the support of two Sales Assistants.

27. For each Sales Assistant that Plaintiffs elected to retain, they were required to complete and sign annual Election Forms/Participation Agreements. In so doing, Plaintiffs acknowledged their voluntary participation in WaMu's Sales Assistant Program and their agreement to be bound by all applicable terms and conditions set forth in the LCI Plan, the Sales Assistant Plan and the Election Form/Participation Agreement.

28. In the Election Forms/Participation Agreements, Plaintiffs also designated the specific compensation structure for each Sales Assistant they chose to retain. In this regard, Sales Assistants received two distinct forms of compensation: (1) a monthly base salary (plus benefits), and (2) a per-unit bonus for each funded loan.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

6.

29. Regarding Sales Assistant compensation, WaMu agreed to fund up to $2,500 per month (plus benefits) for each Production Qualified Sales Assistant,[1] which amount could be allocated between base salary and bonus at Plaintiffs' discretion.

30. Through the Election Forms/Participation Agreements, Plaintiffs prospectively agreed to allocate a discretionary portion of their gross commissions to cover any amounts for the Sales Assistants' compensation in excess of the bank-subsidized $2,500/month, in the form of a "Commission Threshold" or "Commission Adjustment."

31. For the most part, Loan Consultants, including Plaintiffs, chose to compensate their Sales Assistants with a base salary of $2,500 per month, resulting in the Bank paying 100% of most Sales Assistants' base salary and benefits. In turn, the Sales Assistants' per-unit bonus amounts were generally the only amount allocated from gross commissions.

32. However, Plaintiffs retained the discretion to adjust the base salary of their Sales Assistants upward or downward from the $2,500 amount paid by WaMu. Accordingly, Plaintiffs could set a Sales Assistant's base salary at less than $2,500 and use the remaining portion of the Bank-allocated funds to compensate their assistants for per-unit bonus amounts. Alternatively, Plaintiffs could set a Sales Assistant's base salary at an amount greater than $2,500, subject to the condition that Plaintiffs would normally absorb this additional expense (plus benefits adjustment).

---

[1] In some plan years, lower-producing Loan Consultants had the option to take on a Non-Production Qualified Sales Assistant and, in later years, a Partial-Production Qualified Sales Assistant. With respect to these categories of assistants, WaMu absorbed less (or none) of the Sales Assistant's compensation, and instead, the Loan Consultant would be responsible for these amounts through the allocation of a Commission Threshold or Adjustment. However, none of the Plaintiffs ever worked with a Non-Production Qualified Sales Assistant, and only one Plaintiff (Hoffman-Barron) worked with a Partially-Production Qualified Sales Assistant, and only for a few short months before that Assistant became a Full-Production Qualified Sales Assistant. All of Plaintiffs' Sales Assistants were otherwise Full-Production Qualified at all times.

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

7.

33. In fact, in some cases, WaMu agreed to fund in excess of $2,500 toward Plaintiffs' Sales Assistants' compensation. In this regard, in or around August 2002, Plaintiff Hoffman-Barron qualified for a third Sales Assistant, in addition to her two existing assistants; rather than hire an additional team member, Hoffman-Barron was approve for an exception that allowed her to reallocate the $2,500 WaMu would have paid toward a third Sales Assistant to raise the base salaries of her two existing assistants. Thus, Hoffman-Barron's assistants began to earn base salaries of $4,500 and $3,000, respectively, the entire amounts of which were funded by the Bank.

34. Similarly, although Minkow and O'Brien eventually qualified for the support of seventeen Sales Assistants as of April 2004, they elected to utilize fewer assistants, and chose to reallocate the additional funds to their existing Sales Assistants.

35. Thus, through the process of determining their Sales Assistants' compensation structure, all Loan Consultants, including Plaintiffs, prospectively decided what amounts, if any, of their gross commissions they would allocate to and share with their Sales Assistants.

36. These discretionary compensation amounts, which Plaintiffs prospectively and voluntarily agreed to absorb, were deemed the "Commission Threshold" or "Commission Adjustment."

37. In this regard, the terms and conditions of WaMu's LCI Plan and Sales Assistant Plan provided that, as a condition precedent to the accrual and payment of commissions, Plaintiffs were required to meet the "Commission Threshold" or "Commission Adjustment" amount, as set forth in the LCI Plans, Sales Assistant Plans, and the Sales Assistant Election Forms/Participation Agreements.

38. Specifically, the Sales Assistant Plans for 2000 and 2001 provided: "Loan Consultants . . . eligible for and electing participating in the Sales Assistant Program agree to meet a commission threshold before qualifying for commission

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

8.

payout . . . . The Loan Consultant . . . WILL NOT be paid commissions until the commission threshold has been met."

39. This same condition continued in subsequent plan years 2002 and 2003,[2] substituting the term "Commission Adjustment" for "Commission Threshold": "[Loan Consultants] eligible for and electing participation in the Sales Assistant Plan agree to a commission adjustment (if required) before qualifying for commission payout. The commission adjustment is the amount subtracted from the [Loan Consultant's] commission for any part of base salary or bonus in excess of the bank-subsidized portion for a Sales Assistant . . . . The [Loan Consultant] WILL NOT be paid commissions until the commission adjustment has been met."

40. Thus, Plaintiffs prospectively agreed to the Sales Assistant Program's condition that, until they met the "Commission Threshold" or "Commission Adjustment" amounts of the Sales Assistant Program they themselves had designated, Plaintiffs themselves did not qualify for or accrue or earn commissions.

41. In addition to the terms and conditions of the Sales Assistant Program, the LCI Plans provided that gross commissions are subject to a reconciliation process, as explained above, before commissions were vested and paid to Plaintiffs.

42. As set forth in the 2002 and 2003 LCI Plans (either in the plan documents themselves and/or in the Administrative Guidelines that accompanied the LCI Plans and were incorporated by reference therein): "Commissions and incentives are not earned when performance occurs. Rather, commissions and incentives are only earned after a calculation and reconciliation period following the end of the relevant Measurement Period. Commissions and incentives are earned on the Reconciliation Date. Participants have no right or entitlement to commission or incentives until the amounts are determined and earned on the Reconciliation Date . . . . The reconciliation date is the date after the close of performance period when Washington Mutual

---

[2] The 2003 Plan remained in effect through and until April 2004.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

9.

calculates commissions and/or bonuses based on the Plan provisions and reconciles items such as cancellations, write-offs, bad loans, outstanding advances, etc."

43. The application of the reconciliation period and the concept that commissions were not earned until after any and all applicable adjustments was WaMu's standard practice, policy and procedure, which applied to all relevant plan years from, at least, 1999 through 2004.

44. This reconciliation process was necessary to determine the amount of commissions that Loan Consultants, including Plaintiffs, were eligible to earn each month, after application of upward adjustments and/or downward adjustments.

45. Since Plaintiffs first began hiring and retaining Sales Assistants pursuant to WaMu's Sales Assistant Program, Plaintiffs' overall loan production steadily increased, which enabled Plaintiffs to continually request and receive the support of additional Sales Assistants.

46. By April 2004, Plaintiff Hoffman-Barron was qualified for the assistance of four Sales Assistants. In this regard, Hoffman-Barron was required to originate no less than $144 million in annual loan volume. Based on the commission tiers set forth in WaMu's 2003 LCI Plan, this meant that Hoffman-Barron likely generated at least $864,000 in gross commissions from these sales, which amount represents only her basis point commissions on this loan volume.

47. Similarly, Minkow and O'Brien qualified for seventeen Sales Assistants as of April 2004. As such, Minkow and O'Brien's partnership must have originated more than $612 million in annual loan production. Accordingly, based on the commission tiers set forth in WaMu's 2003 LCI Plan, Minkow and O'Brien's partnership generated no less than $3.67 million in gross commissions, which amount reperesents only their basis point commissions on this loan volume.

48. Throughout the course of their participation in WaMu's Sales Assistant Program, Plaintiffs were provided with copies of the LCI Plan and Sales Assistant Plan and program documents at the outset of each and every year.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

49. Moreover, Plaintiffs signed Election Forms/Participation Agreements for each Sales Assistant they retained through the Sales Assistant Program, at the outset of every year and/or whenever a Sales Assistant's employment or compensation terms were changed.

50. By signing these Election Forms/Participation Agreements, Plaintiffs expressly acknowledged and agreed to adhere to all of the terms and conditions of the LCI Plan and Sales Assistant Plan and Program, as described in detail above. In this regard, the Election Forms/Participation Agreements explicitly provided: "All parties to this Agreement agree to the terms outlined above . . . and to be bound by the [*Plan Year*] Sales Assistant Program document and its terms . . . . I agree that in conjunction with my participation in the [*Plan Year*] Sales Assistant Program I must meet a Commission Threshold before I will receive a commission payout. The compensation paid to the Sales Assistant (as stated on this form) will be deducted from my commissions as a commission adjustment prior to my receiving commissions."

51. From July 2001 through April 2004 alone, Plaintiff Hoffman-Barron signed at least fifteen Election Forms/Participation Agreements, and Plaintiffs Minkow and O'Brien collectively signed more than thirty Election Forms/Participation Agreements.

52. Further, Plaintiffs were provided with (or had access to) monthly commission statements that provided a line-by-line description of all calculations and adjustments applied during the reconciliation period, including any adjustments related to the Sales Assistant Program, before Plaintiffs' net commission were determined and any amounts were earned or paid out.

53. Plaintiffs were not subject to deductions from their net commissions for, and Plaintiffs' paycheck stubs did not reflect any deductions for, any payments to or for their Sales Assistants.

54. WaMu's LCI Plan provided a specific mechanism by which Plaintiffs had the ability to lodge a complaint or grievance concerning their commissions:

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

11.

"APPEALS. Washington Mutual is committed to providing internal appeal and review procedures regarding Participant incentive or bonus pay concerns and/or disagreements . . . . Participants are encouraged to seek relief or remedy for their concerns or disagreements from the designated Incentive Plan Administrator." Plaintiffs did not lodge any such appeals during their participation in the Sales Assistant Program, or at any time during their employment with WaMu.

55. Instead, Plaintiffs consistently and voluntarily elected to participate in the Sales Assistant Program and to retain the support of Sales Assistants because the additional sales support provided by the Sales Assistant Program enabled them to achieve greater financial success than they would have otherwise been able to achieve without the support of Sales Assistants.

## CONCLUSIONS OF LAW

1. Plaintiffs' First Claim for Relief Fails Because Washington Mutual's Loan Consultant Incentive Plans and Sales Assistant Plans and Program Did Not Violate Plaintiffs' Rights Under California Labor Code Section 221.

2. Plaintiffs' First Claim for Relief Fails Because All Adjustments Related to Plaintiff's Voluntary Participation in Washington Mutual's Loan Consultant Incentive Plans and Sales Assistant Plans and Program Do Not Violate California Labor Code Section 221.

3. Plaintiffs' First Claim for Relief Fails Because All Adjustments Related to Plaintiff's Voluntary Participation in Washington Mutual's Loan Consultant Incentive Plans and Sales Assistant Plans and Program Are Specifically Authorized Pursuant to California Labor Code Section 224.

4. Plaintiffs' Second Claim for Relief Fails Because Washington Mutual Did Not Fail to Pay Plaintiffs All Compensation Due and Owing Upon Plaintiffs' Separation from Employment with Washington Mutual.

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

5. Plaintiffs' Second Claim for Relief Fails Because Washington Mutual Did Not Willfully Fail to Pay Plaintiffs All Compensation Due and Owing Upon Plaintiffs' Separation from Employment with Washington Mutual.

6. Plaintiffs' Third Claim for Relief Under California Business and Professions Code Section 17200 Fails Because It Is Duplicative and Coextensive with Plaintiffs' First Claim for Relief, Which Itself Fails.

Dated: August 6, 2009

_____
HONORABLE MANUEL L. REAL
U.S. DISTRICT COURT JUDGE

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

13.